AUGUSTUS T. MARTIN AND VICTOR S. KILKENNY, AS SUBSTITUTED TRUSTEES, *ETC.*, PLAINTIFFS-RESPONDENTS, v. SARAH L. HAYCOCK, *ET AL.*, DEFENDANTS, AND PATRICK McGILLIGAN, ATTORNEY-GENERAL OF IRELAND, DEFENDANT AND COUNTERCLAIMANT-APPELLANT.

Argued May 21, 1956—Decided June 13, 1956.

(1)

*Mr. John J. Gibbons* argued the cause for appellant (*Messrs. Crummy, Consodine, Gibbons & O'Neill,* attorneys).

*Mr. Edmund B. Hourigan* argued the cause for respondents (*Messrs. Burke, Sheridan & Hourigan,* attorneys).

The opinion of the court was delivered by
WILLIAM J. BRENNAN, JR., J.   The Chancery Division is supervising the administration by its substituted co-trustees

of the foreign charitable trust here involved. The Attorney-General of Ireland brings this appeal because the Chancery Division did not, as he urged, terminate that administration and transfer the trust assets to the Commissioners of Charitable Donations and Bequests for Ireland or other appropriate Irish trustees for administration in Ireland according to Irish law and under the direction of the Irish courts. We certified the appeal here before argument in the Appellate Division.

The will of William J. Sweeney, late of Hudson County, New Jersey, bequeathed his residuary estate to the United States Trust Company of New York "to build, equip and maintain a library in Kilkee, County Clare, Ireland, to be known as THE SWEENEY MEMORIAL LIBRARY." The bequest was subject to a life estate of the income for his wife; but she predeceased Dr. Sweeney, and the Trust Company declined to accept the appointment as trustee.

In proceedings brought a decade ago by the executors for a construction of the will whether the bequest was valid, and alternatively whether the trust failed because the Trust Company refused to act as trustee, the former Court of Chancery held that a valid charitable trust was created and would not be allowed to fail for want of a trustee, but that substituted trustees would be appointed. *Martin v. Haycock,* 140 *N. J. Eq.* 450 (*Ch.* 1946). The Attorney-General of Ireland urged at that time also that the trust should be turned over to the Commissioners of Charitable Donations and Bequests for Ireland for administration, but the court refused to do so and appointed as substituted co-trustees Augustus J. Martin, a New York resident and an executor under the will, and Edward P. McCluskey, a New Jersey resident. McCluskey died a year later and Victor S. Kilkenny was appointed to succeed him.

The substituted co-trustees have since secured a site in Kilkee and have built and equipped a library building thereon. They have also employed a library staff and have otherwise satisfactorily arranged for the operation of the library. Their total expenditures for these purposes have

approximated $62,000. They have expended in addition some $18,000 for expenses of administration, of which almost $14,500 was for the travel expenses of the trustees and their counsel in going to Ireland to arrange for the construction of the library building and otherwise to attend to the performance of their duties. There remains in their hands in addition to the library about $230,000 of principal and income invested in United States Government Bonds except for relatively small amounts of cash on deposit in a bank in Union City, New Jersey, and in a bank in Kilkee.

The instant proceeding was brought by the substituted co-trustees for the approval of their intermediate account, for allowance of commissions and counsel fees, for instructions how to deal with certain later mentioned problems arising in the management of the library, and for an order continuing them in office as co-trustees. The Attorney-General of Ireland made no objection to the account nor to the requests for allowances. He did, however, counterclaim and cross-claim for an order directing the substituted co-trustees "to turn over to such body or trustee in Ireland, as this Court after appropriate consideration may deem proper, the *corpus* of the trust referred to in the complaint upon such terms as this Court finds will assure the continuation of the trust for the purposes" intended by the testator. In due course the Attorney-General made a motion for summary judgment, supported by affidavits, which was met by a motion of the substituted co-trustees for judgment on the pleadings upon the ground that the counterclaim and cross-claim failed to state a claim upon which relief could be granted. Without opinion, the trial judge denied the Attorney-General's motion for summary judgment and granted the motion of the substituted co-trustees for judgment on the pleadings.

The action of the trial court in granting judgment on the pleadings implies that the trial judge felt that he must deny the Attorney-General's application as a matter of law. Such is not the case. The general rule is that, unless an intention that administration is to be supervised by the

courts of his domicil is expressed by the testator in his will or is clearly to be collected therefrom, the courts of the testator's domicil will not ordinarily administer a foreign charity created by his will but will direct that the money be paid over to proper persons at the *locus* of the charity, leaving its administration to the courts of that place. This is so at least when the charity is not repugnant to our laws and is in accordance with the laws of the foreign place, attributes conceded to be true of Dr. Sweeney's charity.

The general rule has been recognized at least since the decision in 1753 in *Provost, Bailiffs, etc., of Edinburgh v. Aubery, Amb.* 236, 27 *Eng. Rep.* 157. There a testator devised South Sea annuities to English trustees for the relief of the poor of Edinburgh, Scotland, and adjacent towns. Lord Hardwicke held that he could not instruct the trustees how to distribute the money as the problem was one for decision by the courts of Scotland, and therefore directed that the annuities should be transferred to trustees in Scotland to be applied to the trusts in the will.

The *Aubery* principle has been recognized and approved by the leading text writers, see 3 *Scott, Trusts* (1939), p. 2013, 2A *Bogart, Trusts and Trustees* (1953), p. 222, 2 *Perry, Trusts and Trustees* (1929), p. 1268, and in our sister jurisdictions, *Green v. Fidelity Trust Co. of Louisville,* 134 *Ky.* 311, 120 *S. W.* 283 (*Ct. App.* 1909), *Beidler v. Dehner,* 178 *Iowa* 1338, 161 *N. W.* 32 (*Sup. Ct.* 1917), *Dwyer v. Leonard,* 100 *Conn.* 513, 124 *A.* 28 (*Sup. Ct. Err.* 1924), *Klumperl v. Vrieland,* 142 *Iowa* 434, 121 *N. W.* 34 (*Sup. Ct.* 1909), and has been stated in the legal encyclopedias to be the rule established by the current of authority, 14 *C. J. S., Charities,* § 78, p. 557; 10 *Am. Jur., Charities, p.* 667. In our own State the *Aubery* decision was expressly cited and followed in *Taylor v. Trustees of Bryn Mawr College,* 34 *N. J. Eq.* 101 (*Ch.* 1881), where reference is also made to a number of other authorities to the same effect.

Dr. Sweeney's will contains no expressed preference or direction for a New Jersey administration of his foreign charity. The substituted co-trustees insist, nevertheless,

that such is to be clearly gleaned from his appointment of the New York trust company as trustee. We fail to see how designation of a corporate trustee in another state supports an inference of intention to have administration and management under the direction of the New Jersey courts. Indeed the *Restatement, Conflict of Laws, sec.* 298 (*c*), records the prevailing view to be that if the testator appoints as trustee a trust company of another state, presumptively his intention is that the trust should be administered in the latter state according to its laws. Although the cited rule has been labeled "at most a rule of construction to be used in the ascertainment of the intention of the testator; it is not conclusive," *In re Johnston's Estate,* 127 *N. J. Eq.* 576 (*Prerog.* 1940), affirmed *o. b.,* 129 *N. J. Eq.* 104 (*E. & A.* 1941); nothing appears in Dr. Sweeney's will, as did appear in the will before the court in the *Johnston* case, to support the idea that the intention of the testator was that his foreign charity should be administered by the New Jersey courts according to New Jersey law. The designation of the New York trust company is more logically explained as being motivated by Dr. Sweeney's provision of a life estate in the trust for his wife. At all events, having in mind that New Jersey adheres to the rule that its courts should not ordinarily administer a foreign charity, the provision in question does not suffice to support the proposition that an intention to have a New Jersey administration can be clearly collected from the will.

It is appropriate at this juncture to emphasize that we are not presently otherwise concerned with matters requiring the construction of Dr. Sweeney's will. All parties apparently assume, and not without reason as we read the will, that the inquiries in that regard were exhausted, except for the instant question, in the proceeding which led to the opinion in *Martin v. Haycock, supra.*

The case of *Rosenbaum v. Garrett,* 57 *N. J. Eq.* 186 (*Ch.* 1898), cited by the substituted co-trustees in support of their position, is plainly distinguishable. There the court had before it the question whether the will of a

Pennsylvania decedent created an active or a passive trust. The beneficiary of the trust and the trustee were New Jersey residents. If the law of Pennsylvania applied the trust was active and the beneficiary was not entitled to the turn over of the trust *corpus*. If the law of New Jersey applied, the trust was passive and the beneficiary was entitled to immediate distribution. Vice-Chancellor Reed carefully distinguished the problem of construction of the will for the purpose of the determination of the interest of the beneficiary thereunder from the problems of construction concerned with the administration and management of the trust. He rejected the proposition that the question before him was to be resolved by analogy to the principle that a "bequest to a foreign charity" "would import that the fund was to be employed and administered for the general purposes of the charity by the persons and in the manner provided for by [the foreign] laws and regulations." The issue, he said, was the "right of the *cestui que trust* in the trust fund," a "question of construction" drawing in the rule that "the testator is presumed to have used the words creating the trust in view of the law of the state of his domicil." Accordingly, he ruled that the law of Pennsylvania applied and that the trust was an active trust. Applying his reasoning to the instant case, New Jersey law presumes that the testator intended that a foreign charity created by his will should generally be turned over to the foreign place for administration under its laws unless an intention to have administration under the laws of and by the courts of his domicil is expressed or is clearly implied in the will. As the court of the testator's domicil employing this canon of construction provided by our law, we are led to the conclusion that unless reasons not connected with the testator's intention are controlling, this trust should be transferred to proper persons in Ireland, leaving to the courts of that nation the task of seeing to the due administration of the charity.

But a transfer is not always to be directed merely because no contrary intention, opposed to the application of the general rule, can be discovered in the testator's will.

The rule does not have the force of a jurisdictional principle denying the New Jersey courts the power to administer the foreign charity. It is grounded, rather, in the practicalities of administration which argue against the hazard of ineffective accomplishment, perhaps even defeat, of the testator's charity implicit in administration remote from its *locus*. Our courts have not hesitated to refuse to transfer a fund provided for a foreign charity when it appeared that conditions at the *locus* indicated that rather than be devoted to the charity the fund would be confiscated by a totalitarian power. They directed the payment of the fund into court, as may be done under *N. J. S. A.* 3*A* :25–10, pending proof that payment can be made with assurance that the testator's intention will be accomplished. *In re Url's Estate,* 7 *N. J. Super.* 455 (*Cty. Ct.* 1950), appeal dismissed, 5 *N. J.* 507 (1950) ; *In re Volencki's Estate,* 35 *N. J. Super.* 351 (*Cty. Ct.* 1955). In any event, paraphrasing what was said by Chancellor Runyon in *Taylor v. Trustees of Bryn Mawr College, supra,* 34 *N. J. Eq.,* at *page* 105, it is obviously due to the proper administration of justice, arising from a proper regard of our responsibilities to see to the effectuation of our domiciliary's intent, that our courts should, before ordering transfer of the funds of the foreign charity to the *locus,* be satisfied as to the qualifications and competency of the foreign agencies or trustees to discharge and administer the trust as the testator planned it.

The substituted co-trustees do not make a strong showing of a danger that the Sweeney charity may not be properly accomplished if the fund is given over to Irish authorities or trustees for administration under Irish laws, and the Attorney-General of Ireland presents a persuasive case for a most suitable administration in that circumstance. The substituted co-trustees do suggest that undefined "international conditions" pose the risk that the *corpus* may not remain invested in United States Government Bonds, but, apart from the fact that the proofs indicate that the Commissioners would continue such investments, the co-trustees do not indicate why other investments would not be equally

sound. They conjure possible catastrophe for the charity if "in the future, by statute or otherwise, memorial libraries are forbidden in Ireland, or, suppose all libraries are nationalized or suppose [the most unlikely] that reading in general is suppressed in that country." These are admittedly most strained conjectures without the slightest evidential support. With far greater force we may take notice that the Irish nation will not so lightly forsake the traditions of freedom and the historic adherence to the free world standards which are as fervently held dear in Ireland as they are in our own country.

The more pertinent inquiry is as to the manner in which the charity would be administered if transferred, and whether any features of that administration cast doubt upon the qualifications and competency of the administration to effectuate Dr. Sweeney's charity.

Under Irish law, according to the Attorney-General's affidavits, unchallenged in this regard by the substituted co-trustees, the fund may be transferred either to the Commissioners of Charitable Donations and Bequests for Ireland or to specially named trustees resident in Ireland. In either case the administration of the charity would be supervised by the Irish courts according to a scheme for administration first submitted to and approved by those courts. In either case, also, the Attorney-General of Ireland has a responsibility toward the charity comparable to the responsibility of the Attorney-General of New Jersey to safeguard the enforcement of charitable trusts in this State. The difference is that specially appointed trustees would both administer the fund and manage the charity, whereas the practice of the Commissioners is to concern themselves with the conservation and investment of the funds and to leave the management of the charity to other trustees specially appointed by the Irish courts for the purpose.

The Commissioners of Charitable Donations and Bequests for Ireland is a public body incorporated by statute. It has been in existence for a century and holds and administers large sums of money for charitable purposes, ap-

plied in accordance with the provisions of the particular trusts providing such funds. The Commissioners, of whom there are presently 11, are a non-salaried body of distinguished Irish citizens, including a Justice of the Supreme Court of Ireland, the Registrar of Titles, the Coadjutor Bishop of Dublin, the Rector of Dublin's St. Patrick's Cathedral, a former Secretary of the Department of Justice, the Chairman of the Upper Council, the Parliamentary Draftsman, and the Permanent Legal Adviser to the Attorney-General.

██ We think that upon this record there is a satisfactory showing of the qualifications and competency of the Commissioners to receive the assets of this charity. We may properly assume that it is not without good reason that this body follows the practice of concerning itself with the fund, particularly, leaving the management of the charity, here the library, to trustees specially appointed for the purpose under a scheme approved by the appropriate Irish court. Apparently the Commissioners have the power also to manage the library if they see fit, but it is wholly appropriate that the decision in that respect be one of their sound discretion. The alternative of excluding the Commissioners and conditioning the transfer upon the appointment of other trustees who will both administer the fund and manage the charity need not be given further consideration in the circumstances.

Having concluded that the proofs establish the qualifications and competency of the Commissioners favorably to the transfer, the desirability of the transfer is made apparent by the record. Now that the library has been built, the problems of the future which should concern us are those arising from the library's operation and maintenance, since the matter of the investment and safeguarding of the funds would be under the guidance of the Commissioners. The substituted co-trustees have themselves demonstrated the embarrassments and awkwardness of remote management of the library. They have been engaged in a controversy with the local governing body of Kilkee which is insistent upon a

voice in that management. The substituted co-trustees have recognized the legitimacy of the claim and have proposed the constitution of a local management council composed of the librarian, the pastor of a local church and a representative to be appointed by the Kilkee Town Council. The town council will have nóne of the arrangement but wants the sole voice in the matter.

Too, the town council desires that the substituted co-trustees alter their regulations confining the use of the library facilities to purely library functions. Other uses than library uses pose a threat of the loss of the library's local tax exemption, and it was necessary to employ local counsel in Kilkee to obtain advice on the question.

The trial court was requested to instruct the substituted co-trustees how to proceed with these matters. Evidence of the understandable inability of our courts competently to give such instructions, handicapped as they must be, and as an Irish court is not, by lack of knowledge of local conditions, customs and laws, is found in the fact that the trial court was able to give only the scarcely precise instruction included in the judgment,—"that the plaintiff-trustees be and they are hereby instructed to make the Library facilities in Kilkee available for community purposes of a nature not inconsistent with the proper functioning of the Library and without pecuniary profit to the trust, and subject to such regulations as in the judgment of the Trustees are essential."

The conclusion seems unavoidable that the continued administration of this charity from New Jersey can only be inefficient and unduly expensive, not alone from a consideration of the high expenses for travel which must be incurred if the New Jersey trustees continue their supervision, but from the nature and extent of the services which must be secured locally if the library is to be well and efficiently run in the absence of the trustees. It is difficult to envisage a case more appropriate for administration at the *locus,* and where remote administration from New Jersey is more unseemly. Our courts would be remiss in our obligation to this New Jersey testator if they continued longer to risk

the possible impairment of the testator's purpose necessarily implicit in the factors of distance and want of knowledge of the local customs and conditions which disable our courts and its trustees from the fully efficient performance of the duties of administering the charity at minimum expense.

It should be emphasized that our trustees are co-trustees substituted for the trustee of the testator's own selection. The choice of a substituted trustee brings into play the three objectives sought to be served by his selection, namely, the wishes of the creator of the trust, the interests of all the beneficiaries, and the effectual performance of the trust. *In re Tempest,* 1 *L. R.* 485 *(Ch. App.* 1866); 4 *Pomeroy's Equity Jurisprudence (5th ed.), sec.* 1087, *p.* 261; 1 *Restatement, Trusts, sec.* 108(*d*). However proper the original appointment of the substituted co-trustees before the library was built, when the court might reasonably have felt an uncertainty as to whether the gift should be committed to other hands pending the formulation of definite plans, now that the library is in being and the problems of its management have become uppermost, the transfer of the trust for administration in Ireland best serves all three objectives, and the substituted co-trustees should be relieved of further responsibility in that regard.

The order of January 13, 1956 is reversed; paragraph 1 of the judgment of February 16, 1956 shall be excised from that judgment; the cause is remanded to the Chancery Division with direction for the entry, upon notice, of a judgment consistent with this opinion appropriate to accomplish the transfer to the Commissioners of Charitable Donations and Bequests for Ireland of so much of the trust assets as shall remain after the allowance according to law of all proper charges.

*For reversal*—Chief Justice VANDERBILT, and Justices WACHENFELD, JACOBS and BRENNAN—4.

*For affirmance*—Justices HEHER and OLIPHANT—2.